Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
**OKIN ADAMS LLP**
1113 Vine St, Suite 201
Houston, Texas 77002
Tel: 713.228.4100
Fax: 888.865.2118
mokin@okinadams.com
dcurry@okinadams.com

Raymond J. Urbanik
Texas Bar No. 20414050
**OKIN ADAMS LLP**
3811 Turtle Creek Blvd.,
Suite 780
Dallas, Texas 75219
Tel: 214.382.4995
Fax: 888.865.2118
rurbanik@okinadams.com

Attorneys for the Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **ARMADA LEASING, LLC** | § | **Case No. 17-32498-11** |
| | § | |
| **HIGH COUNTRY** | § | **Case No. 17-32503-11** |
| **TRANSPORTATION, INC.,** | § | |
| | § | **[Jointly Administered Under** |
| | § | **Case No. 17-32498-11]** |
| | § | |
| **Debtors.** | § | **Chapter 11** |

## SECOND AMENDED DISCLOSURE STATEMENT IN
## SUPPORT OF JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## HIGH COUNTRY TRANSPORTATION, INC. AND ARMADA LEASING, LLC

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF ARMADA LEASING, LLC AND HIGH COUNTRY TRANSPORTATION, INC., DATED AS OF APRIL 20, 2018 (AS AMENDED FROM TIME TO TIME, THE "PLAN"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN, DOES SO AT ITS OWN RISK.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS

SOLICITATION.   THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.   EACH CREDITOR AND HOLDER OF AN EQUITY INTEREST THAT IS ENTITLED TO VOTE ON THE PLAN SHOULD READ, CONSIDER, AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

**THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO THE DEBTORS AND VARIOUS NON-DEBTOR PARTIES AND RELEASES AS TO VARIOUS NON-DEBTOR PARTIES FOR CERTAIN POSTPETITION ACTIONS IN CONNECTION WITH THE BANKRUPTCY CASES, WHICH PROVISIONS WOULD ENJOIN THE DEBTORS, HOLDERS OF CLAIMS, AND HOLDERS OF EQUITY INTERESTS FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN. ALL CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE VIII OF THE PLAN ON EXCULPATION FROM LIABILITY AND RELEASES.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.   PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.   SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE.   THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.   THIS DISCLOSURE STATEMENT IS DATED AS OF MARCH 7, 2018, AND HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE BANKRUPTCY CASES IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR IN THE BANKRUPTCY CASES BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE PLAN CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, CERTAIN PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTIES, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY.    NONE OF THE ATTORNEYS,

2

ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTORS MAKE ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

THE DEBTORS HAVE ATTEMPTED TO PRESENT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCURATELY AND FAIRLY. THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE BY THE DEBTORS, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTORS' CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS VOTES TO REJECT THE PLAN, (1) THE DEBTORS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. ANY TERM USED IN THE PLAN OR HEREIN THAT IS NOT DEFINED IN THE PLAN OR HEREIN AND THAT IS USED IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES HAS THE MEANING ASSIGNED TO THAT TERM IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES, AS THE CASE MAY BE. IF THERE IS ANY CONFLICT BETWEEN THE DEFINITIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE DEFINITIONS CONTAINED IN THE PLAN, THE DEFINITIONS CONTAINED IN THE PLAN SHALL CONTROL.

## DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

## I. INTRODUCTION

High Country Transportation, Inc. and Armada Leasing, LLC, as debtors and debtors in possession in the Bankruptcy Case (collectively, the "Debtors"), have filed with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), their Second Amended Chapter 11 Plan of Reorganization dated as of April 20, 2018 (as may amended from time to time, the "Plan"). This Second Amended Disclosure Statement in Support of the Chapter 11 Reorganization of Armada Leasing, LLC and High Country Transportation, Inc., dated as of April 20, 2018 (the "Disclosure Statement"), is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against, and Impaired Equity Interests in, the Debtors entitled to vote on the Plan.

This Disclosure Statement has been approved by the Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of Holders of Claims and Equity Interests in the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. Such approval of this Disclosure Statement by the Court and the transmittal of this Disclosure Statement do not, however, constitute a determination by the Court as to the fairness or merits of the Plan and should not be interpreted as being a recommendation by the Court either to accept or reject the Plan.

IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER A LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

Accompanying or included as Exhibits to this Disclosure Statement are copies of the following documents:

1. the Plan, including any Exhibits thereto (except as otherwise expressly provided in the Plan), included as Exhibit 1 to this Disclosure Statement;

2. Liquidation Analysis included as Exhibit 2 to this Disclosure Statement;

3. List of payments made by the Debtors during the 90-day period prior to the Petition Date, included as Exhibit 3 to this Disclosure Statement; and

4. Schedule of Surrendered and Sold Assets is included as Exhibit 4 to this Disclosure Statement.

5. Schedule of Retained Causes of Action is included as Exhibit 5 to this Disclosure Statement.

## II.    PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests entitled to vote on the Plan with adequate information to make an informed judgment about the Plan.  This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (c) general information about the businesses, properties, and operations of the Debtors, (d) the events leading to the filing of the Bankruptcy Cases, (e) a liquidation analysis for the Debtors, and (f) a summary of significant events which have occurred to date in the Bankruptcy Cases.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the Confirmation of the Plan.  All Holders of Claims and Equity Interests entitled to vote on the Plan are encouraged to review carefully this Disclosure Statement.

## III.    VOTING INSTRUCTIONS

### A.    <u>Who May Vote</u>

Only the Holders of Claims and Equity Interests which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan.  For purposes of the Plan, only the Holders of Claims and Equity Interests in the Voting Classes (Classes 2, 3, 4, 5, 7, and 8) are Impaired under the Plan and thus may vote to accept or reject the Plan.  ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS ONLY BEING PROVIDED TO MEMBERS OF THE VOTING CLASSES.

### B.    <u>How to Vote</u>

Each Holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety.  After carefully reviewing the Plan and this Disclosure Statement and any Exhibits thereto, please complete the enclosed Ballot, including marking your vote with respect to the Plan, and return it as provided below.  If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim.  If you receive more than one Ballot, you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Matthew S. Okin, counsel to the Debtors, by telephone at (713) 228-4100 or by electronic mail at <u>mokin@okinadams.com</u>.

**YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT TO THE ADDRESS PROVIDED BELOW.  IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED NO LATER THAN MAY 21, 2018 (THE "VOTING DEADLINE").**

All Ballots should be returned either by regular mail, hand delivery, overnight delivery, or email to:

OKIN ADAMS LLP
Attn: Matthew S. Okin
1113 Vine Street, Suite 201
Houston, Texas 77002
mokin@okinadams.com

**C.      Acceptance of Plan and Vote Required for Class Acceptance**

As the Holder of a Claim in one of the Voting Classes, your vote on the Plan is extremely important. The Debtors are soliciting acceptances of the Plan only from Holders of Claims in Voting Classes, which are the only Classes entitled to vote on the Plan. You may be contacted by the Debtors or their representatives with regard to your vote on the Plan.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims which votes to reject, or is deemed to have rejected, the Plan (a "Rejecting Class"), the Debtors would have to show that all Classes junior to the Rejecting Class will not receive or retain any Property under the Plan unless all Holders of Claims in the Rejecting Class receive or retain under the Plan Property having a value equal to the full amount of their Allowed Claims. For a more complete description of the implementation of the "cram-down" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN -- Confirmation Without Acceptance by All Impaired Classes" in Section IX. B. hereof.

**D.      Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for May 31, 2018 at 9:30 a.m. (the "Confirmation Hearing"), at the courtroom of the Honorable Stacey G. C. Jernigan, United States Bankruptcy Court, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, Texas 75242, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to Confirmation of the Plan must be filed and served in accordance with the Disclosure Statement Approval Order. Pursuant to the Disclosure Statement Approval Order, any such objection must be filed with the Bankruptcy Court by no later than May 21, 2018.

## IV.    OVERVIEW OF THE DEBTORS' BUSINESSES

The information contained in this section of the Disclosure Statement is intended as a summary of the Debtors' history and business operations prior to the Petition Date.

On and before the Petition Date, High Country Transportation, Inc. ("HCT"), a Utah corporation, and Armada Leasing, LLC ("Armada" and collectively with HCT, the "Debtors") owned and operated a transportation business headquartered in Dallas, Texas. The Debtors' headquarters is located in a leased office at 400 North St. Paul Street, Suite 400, Dallas, TX 75201. HCT and Armada are each 100% owned by Donald Crowley, Shawn Crowley, and Kirk Crowley.

The Debtors' operations involved three lines of business: (i) Hopperbottom Division (founded in 1985); (ii) Coal Haul Division (founded in 2004); and (iii) Dry Van Division (founded in 2013). The Debtors' fleet consisted of two hundred and twenty-four (224) trucks (the "Fleet"), including twenty-two (22) trucks for the Hopperbottom Division, forty-four (44) trucks for the Coal Haul Division, and one hundred fifty-eight (158) trucks for the Dry Van Division. The Hopperbottom Division operated throughout most of the continental U.S. The Coal Haul Division operated in Colorado, New Mexico, and Arizona. The Dry Van Division operated throughout the entire continental U.S.

The Debtors' Fleet included five makes – seventy-three (73) Kenworths, fifty-four (54) Peterbilts, fifty (50) Freightliners, forty-five (45) Volvos, and two (2) International – all of multiple models and years. All trucks in the Fleet were compliant with rules issued by the Federal Motor Carrier Safety Administration requiring carriers to install and use electronic logging devices to monitor miles and enforce hours of service by December 18, 2017.

All of the Freightliner trucks were financed through Daimler Truck Financial and its affiliates ("Daimler"), except for one, which was financed by People's Capital and Leasing Corp. ("People's"). All of the Volvo trucks were financed through VFS US LLC and its affiliates ("Volvo"). All of the Peterbilt trucks were financed through Paccar Financial Corp. and its affiliates ("Paccar"). Of the Kenworth trucks, twenty-four (24) were financed through MHC Financial Services, Inc. and its affiliates ("MHC"), forty-three (43) were financed through Paccar, and five (5) were financed through People's. Both of the International trucks were financed through BMO Financial ("BMO"), as assignee for General Electric Capital Corporation. Two (2) Peterbilt trucks and one (1) Kenworth truck were owned by the Debtors. Certain trucks in the Fleet were subleased to contract drivers. Subleased trucks included seventeen (17) Peterbilts, sixteen (16) Freightliners, twelve (12) Volvos, and seven (7) Kenworths for a total of fifty-two (52) trucks, all of which were part of the Debtors' businesses as of the Petition Date.

The Debtors' businesses also involved one hundred fifty-eight (158) trailers (the "Trailers"), including fifty-nine (59) Hyundai, forty-four (44) Wilsons, thirty-eight (38) Great Danes, and seventeen (17) Cornhuskers. The Trailers included sixty-eight (68) 2016 models, sixty-five (65) 2015 models, twenty-three (23) 2014 models, and two (2) 2011 models. These Trailers were financed through Signature Financial, 1st Source Bank, Dolores State Bank, Merchants Capital Resources, Scottrade Bank Equipment Finance, and Webster Capital Finance.

Expenses for the Debtors' day-to-day operations included payroll, rent, utilities, fuel, and repairs. Prior to the Petition Date, the Debtors had fourteen (14) salaried and eleven (11) hourly

7

employees. In addition, the Coal Haul Division employed sixty-four (64) company drivers, the Hopperbottom Division employed thirteen (13) company drivers, and the restructured Dry Van Division employed two (2) company drivers. Further, the Hopperbottom Division worked with twelve (12) independent contractor drivers and the restructured Dry Van Division worked with fifty-one (51) independent contractor drivers.

On May 22, 2013, the Debtors entered into a credit agreement, as has been amended from time to time, with an affiliate of Marquette Transportation Finance, Inc. ("Marquette") under which Marquette advanced up to 90% of the value of qualified trade receivables (the "Marquette LoC"). Customers make payments to a lockbox controlled by Marquette, who then applies the amount collected to the balance outstanding on the line of credit after deducting accrued interest at a variable rate of prime plus 2% (6.25% as of the Petition Date) and a fee of 0.25% of the underlying invoice amount. As of the Petition Date, the Debtors' accounts receivable totaled approximately $2,900,000.00, qualified trade receivables totaled approximately $1,800,000.00, and the outstanding balance on the Marquette LoC was $1,300,000.00.

On September 25, 2014, the Debtors entered into a credit agreement with Dolores State Bank ("DSB") for a revolving line of credit (the "DSB LoC") whereby the Debtors could borrow up to $950,000.00 at a variable rate of prime plus 1.5% (5.75% as of the Petition Date). As of the Petition Date, the outstanding balance on the DSB LoC was $843,101.94. The DSB LoC was secured by real property owned by High Country Partnership in Colorado, a non-debtor affiliate of the Debtors.

Additionally, HCT maintained a prepetition bank account with Citizens Nation Bank of Texas; and HCT and Armada maintained bank accounts at DSB.

For the year ended December 31, 2016, the Debtors generated $42.8 million in net sales and a loss from operations of $2.3 million. For the year ended December 31, 2015, the Debtors generated $48.5 million in net sales and income from operations of $1.4 million. For the year ended December 31, 2014, the Debtors generated $47.6 million in net sales and income from operations of $2.4 million.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILING

After the Debtors launched the Dry Van Division in 2013 and expanded it in 2014, the industry dynamic began declining in 2015. While demand remained favorable from customers of the Dry Van Division, the Debtors struggled to find enough qualified company drivers to fulfill their customers' needs. Long haul routes require many days on the road where drivers sleep in their trucks and are away from their families. As a result of these undesirable job requirements, the Dry Van Division experienced significant turnover of drivers, burdening the Debtors with costly and time-consuming recruiting and training of replacement drivers. To become a driver for the Dry Van Division, candidates needed to possess a valid Class A commercial driver's license and pass a drug test.

During the 18 months prior to the Petition Date, an average of thirty (30) trucks in the Dry Van Division fleet remained idle for lack of drivers, even though there was demand from customers for more work. The cumulative drain on the Debtors' cash from paying monthly lease expenses on idle trucks without corresponding revenue created a cash crunch by the end of 2016.

The Debtors' initial restructuring efforts proved insufficient. After a proposed sale of the Dry Van Division fell through in May 2017, the Debtors and their financial advisors created a more substantial restructuring plan whereby the Debtors exited the Dry Van Division involving company drivers in order to focus on contract drivers instead.

As such, beginning in May 2017, the Debtors sought to dispose of one hundred eight (108) trucks from the Fleet. These trucks included thirty-three (33) Peterbilts financed by Paccar, thirty-two (32) Volvos financed by Volvo, (30) Freightliners financed by Daimler, and thirteen (13) Kenworths financed by MHC. The focus of the Hopperbottom Division and Coal Haul Division remained unchanged, and the ongoing business plan would utilize one hundred sixteen (116) trucks in the Debtors' Fleet. The Debtors also sought to sell ninety-six (96) trailers, and use the remainder to continue operating their businesses. The Debtors believed that the fair market value of these trailers exceeded the amount owed to creditors under the relevant financing agreements.

Exiting the Dry Van Division utilizing company drivers involved multiple steps, including (a) unwinding financial agreements relating to 108 trucks, (b) unwinding financial agreements relating to 96 trailers, (c) selling, real estate, equipment and surplus assets located in Midlothian, Texas, which was no longer needed due to the Fleet reduction, (d) eliminating administrative employees, including maintenance, recruiting, and accounting staff, (e) eliminating nearly all company drivers in the Dry Van Division, (f) relocating the headquarters from the Midlothian office to the Dallas office, and (g) collecting accounts receivable and settling accounts payable relating to discontinued operations.

As the Debtors proceeded with Step (a), they reached an impasse with one particular counterparty, Paccar, regarding the sale of twenty-eight (28) 2013 Peterbilt trucks to a third party. While Paccar supported the sale in theory, Paccar insisted on prompt payment from the Debtors of approximately $462,000 in cash in order to transfer titles for the trucks to the third party. This amount related to an alleged deficiency between the payoff amounts on leases related to the trucks and the amounts being paid by the third party, less a discount offered by Paccar. Since the Debtors' liquidity did not support such a large cash payment to Paccar, the Debtors proposed a larger discount and Paccar refused.

On June 26 and June 27, 2017, Paccar reacted to the impasse by declaring a cross default on all of the Debtors' trucks financed with Paccar and claiming that, as a result, the Debtors owed Paccar millions of dollars in damages. On June 28 and June 29, 2017, Paccar's agents unsuccessfully attempted to repossess ninety-two (92) of the Debtors' trucks. Repossession of the Debtors' trucks would have been catastrophic to their operations.

These Bankruptcy Cases were filed to give the Debtors necessary breathing room to finish their reorganization and complete a fair and equitable distribution to their creditors. As of the Petition Date, the Debtors had voluntarily surrendered twenty-five (25) Freightliners to Daimler and thirty-one (31) Volvos to Volvo. No trucks were returned to Paccar or MHC due to ongoing negotiations between the parties.

## VI. SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

### A. <u>Introduction</u>

On June 29, 2017 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11, title 11 of the United States Code (the "Bankruptcy Code"). Armada was assigned case number 17-32498, and High Country was assigned case number 17-32503. As further explained below, these cases are jointly administered under Armada's case number 17-32498. The Debtors remain in possession of their property and continue to manage their assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. A brief summary of significant matters or events that have occurred to date in the Bankruptcy Cases is set forth below. The description of such matters or events is qualified in its entirety by the actual pleadings filed in the Bankruptcy Cases and, to the extent of any inconsistencies between the descriptions in this Disclosure Statement and such pleadings, such pleadings shall control. All of such pleadings are on file with, and may be obtained from, the Bankruptcy Court.

### B. <u>Joint Administration</u>

On July 3, 2017, Debtors filed their *Emergency Motion for Entry of Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure*. [Doc. No. 10]. On July 7, 2017, the Bankruptcy Court entered its *Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure*. [Doc. No. 23, amended at Doc. No. 31]. Accordingly, the Debtors' Bankruptcy Cases were consolidated and jointly administered, for procedural purposes only, under case number 17-32498 before the Honorable Stacey G.C. Jernigan, United States Bankruptcy Judge.

### C. <u>Debtor in Possession Financing and Cash Collateral</u>

On July 3, 2017, the Debtors filed their *Motion for Entry of Interim and Final Orders Approving the Interim and Final Stipulation and Agreement Regarding Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 363 and/or 365 for Interim and Final Orders Authorizing (I) Debtor-in-Possession Financing and/or (II) Limited Use of Cash Collateral and Granting Adequate Protection* (the "DIP Motion") [Docket No. 14], which requested approval of a stipulation (the "DIP Financing Agreement") between the High Country and Marquette Transportation Finance, LLC ("Marquette") regarding use of cash collateral.

On July 7, 2017, the Bankruptcy Court entered its *Interim Order: (I) Approving Stipulation and Agreement Regarding Debtor High Country Transportation Inc.'s Motion for Post-Petition Financing and Use of Cash Collateral; (II) Granting Liens and Security Interests Pursuant to 11 U.S.C. § 364(c); and (III) Authorizing the Use of Cash Collateral*. [Doc. No. 28].

On July 27, 2017, the Bankruptcy Court entered its *Final Order (I) Approving Stipulation and Agreement Regarding Debtor High Country Transportation LLC's Motion for Post-Petition Financing and Use of Cash Collateral; (II) Granting Liens and Security Interests Pursuant to 11 U.S.C. § 364(c); and (III) Authorizing Use of Cash Collateral* [Doc. No. 55], which approved the DIP Financing Agreement between High Country and Marquette, and authorized High Country to borrow up to $2,500,000.00 in order to fund its operations.

### D.     Schedules and Statements of Financial Affairs

The Debtors filed their Schedules and Statement of Financial Affairs with the Bankruptcy Court on August 7, 2017.  [Doc. Nos. 63, 64, 65, and 66].

### E.     Section 341 Meeting of Creditors

The meeting of creditors pursuant to Section 341 of the Bankruptcy Code occurred on August 8, 2017.  [Doc. No. 46].

### F.     Retention of Professionals by the Debtors

The Debtors retained the law firm of Okin Adams LLP as their general bankruptcy counsel in the Bankruptcy Case.  On August 28, 2017, the Bankruptcy Court entered an *Order Granting Debtors' Application for an Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code Authorizing the Employment and Retention of Okin Adams LLP as Counsel for the Debtors Effective Nunc Pro Tunc to the Petition Date*.  [Doc. No. 89].

The Debtors retained BVA Group Restructuring and Advisory LLC ("BVA") as their financial advisor in the Bankruptcy Case.  On August 28, 2017, the Bankruptcy Court entered an *Order Granting Debtors' Application for Entry of an Order Authorizing the Retention and Employment of BVA Group Restructuring and Advisory LLC as Financial Advisor Nunc Pro Tunc to June 29, 2017*.  [Doc. No. 92].

The Debtors were also authorized to retain other professionals in the ordinary course of business.  Specifically, on August 29, 2017, the Bankruptcy Court entered an *Order Granting Debtors' Expedited Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business*.  [Doc. No. 91].

### G.     The Sale Procedures Motion

On July 19, 2017, the Debtors filed their *Emergency Motion, Pursuant to Bankruptcy Code Sections 105(a); 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006 for Entry of an Order: (I) Approving Notice and Sale Procedures; (II) Authorizing Debtors' Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (III) Approving Adequate Protection Payments; and (IV) Granting Related Relief* (the "Sale Procedures Motion").  [Doc. No. 38].

On July 27, 2017, the Bankruptcy Court entered its *Order on Debtors' Motion, Pursuant to Bankruptcy Code Sections 105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006 for Entry of an Order: (I) Approving Abbreviated Notice and Sale Procedures; (II) Authorizing Debtors' Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Approving Adequate Protection for Equipment Lessors; and, (IV) Granting Related Relief* (the "Sale Procedures Order").  [Doc. No. 56].  The Sale Procedures Order authorized a process whereby the Debtors could sell or surrender assets by filing a Notice of either Sale or Surrender on the Docket, which would trigger an objection period for interested parties.  If no party objected, the Bankruptcy Court would enter its Order Approving the Sale or Surrender.  As

set forth below, the Debtors used this Sale Procedures Order to pare down their assets for an effective reorganization.[1]

On July 27, 2017 the Debtors filed their first *Notice of Proposed Sale* of twenty-six (26) Peterbilt trucks financed by Paccar. [Doc. No. 54]. On August 4, 2017, the Bankruptcy Court entered it *Order of Debtors' Notice of Proposed Sale.* [Doc. No. 58].

On August 15, 2017, the Debtors filed a *Notice of Proposed Surrender* of thirty (30) Freightliner trucks to Daimler. [Doc. No. 75]. On August 24, 2017, the Bankruptcy Court entered the *Agreed Order on Debtors' Notice of Proposed Surrender* to Daimler. [Doc. No. 84]

On August 15, 2017, the Debtors filed a *Notice of Proposed Surrender* of six (6) Volvo trucks to Volvo. [Doc. No. 77]. On September 11, 2017, the Bankruptcy Court entered its *Order of Debtors' Notice of Proposed Surrender* to Volvo. [Doc. No. 99].

On August 24, 2017, the Debtors filed a *Notice of Proposed Surrender* of seventeen (17) Volvo trucks to Volvo. [Doc. No. 85]. On September 1, 2017, the Bankruptcy Court entered its *Order on Debtors' Notice of Proposed Surrender* to Volvo. [Doc. No. 94].

On September 6, 2017, the Debtors filed a *Notice of Proposed Surrender* of thirteen (13) Kenworth trucks to MHC. [Doc. No. 97]. On September 19, 2017, the Bankruptcy Court entered its *Order on Debtors' Notice of Proposed Surrender* to MHC. [Doc. No. 102].

On September 7, 2017, the Debtors filed a *Notice of Proposed Surrender* of nine (9) Volvo trucks to EverBank. [Doc. No. 98]. On September 25, 2017, the Bankruptcy Court entered its *Order on Debtors' Notice of Proposed Surrender* to EverBank. [Doc. No. 111].

On November 7, 2017, the Debtors filed a *Notice of Proposed Sale* of one (1) Peterbilt truck to an individual driver, Kevin McGrath. [Doc. No. 149]. On November 29, 2017, the Bankruptcy Court entered its *Order on Debtors' Notice of Proposed Sale.* [Doc. No. 160].

On December 13, 2017, the Debtors filed a *Notice of Proposed Surrender* of four (4) Peterbilt trucks to Paccar. [Doc. No. 167]. On January 8, 2018, the Bankruptcy Court entered its *Order on Debtors' Notice of Proposed Surrender* to Paccar. [Doc. No. 177].

## H.    The Second Sale Motion and the Auction

On October 27, 2017, the Debtors filed their *Motion for an Order (I) Authorizing the Debtors to Employ an Auctioneer; (II) Approving Sale Procedures for the Sale of Certain Assets; (III) Approve the Sale of Assets Free and Clear of Liens and Encumbrances; and (IV) Granted Related Relief* (the "Second Sale Motion"). [Doc. No. 133].

On November 15, 2017, the Bankruptcy Court entered its *Order Granting Debtors' Motion for an Order (I) Authorizing the Debtors to Employ an Auctioneer; (II) Approving Sale Procedures for the Sale of Certain Assets; (III) Approving the Sale of Assets Free and Clear of Liens and Encumbrances; and (IV) Granting Related Relief* (the "Second Sale Order"). [Doc. No. 156]. The Second Sale Order authorized the Debtors to hire an auctioneer to sell all Hyundai and Great Dane

---

[1] For a complete list, *see* the Debtors' Schedule of Surrendered and Sold Assets attached hereto as **Exhibit 4**.

trailers, free and clear of liens, for a guaranteed amount of $1,650,000.[2]  The auction took place in early December, and on December 15, 2017, the Debtors filed their *Notice of Receipt of Guaranteed Amount from Auction*.  [Doc. No. 170].  By January 2, 2018, all proceeds for the assets sold at Auction were received by the Debtors and the Debtors had distributed the undisputed portions of payoffs to the Lessors pursuant to the Second Sale Order.

## I.    The R.W. Timms Litigation

On May 17, 2017, Debtors reached an agreement (the "Agreement") to sell certain dry van trailers (the "Dry Van Trailers") for $2,333,000.00 and certain real estate (the "Midlothian Real Estate") for $1,800,00.00 to R.W. Timms Leasing, LLC and R.W. Timms TX Investments, LLC (collectively, "R.W. Timms").  Soon thereafter, R.W. Timms took possession of, and began using, approximately eighty-two (82) of the Dry Van Trailers.  R.W. Timms failed to pay for the Dry Van Trailers.

On July 28, 2017, the Debtors, through counsel, sent a letter to R.W. Timms demanding payment for the Dry Van Trailers, pursuant to the Agreement.  Again, R.W. Timms failed to pay for – or return – the Dry Van Trailers.

On September 22, 2017, the Debtors initiated adversary proceeding no. 17-03081 (the "Adversary Proceeding") by filing their Original Complaint against R.W. Timms.  [Adv. Pro. Doc. No. 1].  Simultaneously, the Debtors filed with the Bankruptcy Court their *Emergency Application in Support of Order Requiring R.W. Timms Leasing, LLC and R.W. Timms TX Investments, LLC to Appear and Show Cause, if any, Why They Should Not be Held in Contempt of Court for Asserting Control over Property of the Estate in Violation of the Automatic Stay Under 11 U.S.C. § 362(a)(3)* (the "Contempt Motion").  [Doc. No. 107].

In the Original Complaint, the Debtors allege, *inter alia*, that R.W. Timms breached the Agreement by failing to pay for the Dry Van Trailers.  At a mediation held on February 15, 2018, the Debtors and R.W. Timms reached an agreement to settle the Adversary Proceeding for $283,000.00.  The Debtors Filed a motion to approve the settlement pursuant to Bankruptcy Rule 9019 [Doc. No. 208] and on April 13, 2018, the Court entered an order approving the settlement.  [Doc. No. 254].  The Debtors expect to have received payment of the settlement amount before the Confirmation Hearing.

## J.    Bar Dates

On July 17, 2017, the Bankruptcy Court entered its *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines* which, among other things, established November 6, 2017, as the deadline for filing Claims against the Debtors by all creditors (not including Governmental Units), and the date that is 180 days from the Petition Date as the deadline for filing Claims against the Debtors by all Governmental Units.  [Doc. No. 36].

---

[2] The guaranteed amount was reduced to $1,633,000 because one the Great Dane trailers (No. 15005) was removed from the Auction.

Pursuant to the Plan, the bar date for the filing of Administrative Expense Claims (the Administrative Claim Bar Date) in the Bankruptcy Case is thirty (30) days after the Effective Date of the Plan.

## VII. SUMMARY OF THE PLAN

### A. Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its creditors and stockholders. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each holder of a claim or equity interest to vote in favor of the plan in order for the bankruptcy court to confirm the plan. A plan must be accepted, however, by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" (within the meaning of Section 101(31) of the Bankruptcy Code) in that impaired class.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself (including the Plan Documents which are referred to therein). The Plan (including the Plan Documents) shall control and, upon Confirmation and the Effective Date, bind the Debtors, the Reorganized Debtors, all of the Debtors' Creditors, Holders of Equity Interests and other parties in interest except as expressly set forth in the Plan. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

The Plan Documents (i.e., all documents that aid in effectuating the Plan) will be filed with the Bankruptcy Court at least ten (10) days prior to the Voting Deadline (unless already on file with the Bankruptcy Court or attached as Exhibits to this Disclosure Statement) provided, however, that (i) the Debtors may amend the Plan Documents through and including the Confirmation Date. Upon their filing with the Bankruptcy Court, the Plan Documents may be inspected in the Clerk's Office during normal business hours, may be obtained from the Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from the Debtors' Bankruptcy Counsel upon written request.

### B. General Overview of the Plan

The Debtors have filed the Plan with the Bankruptcy Court. The Plan provides for distributions to Holders of Allowed Claims and Interests from (i) unencumbered Cash from operations, (ii) any Sale Proceeds (as defined in the Sale Procedures Order) that the Debtors hold from the sale of certain assets during the Bankruptcy Cases, and (iii) the R.W. Timms Proceeds and any other proceeds or net recoveries under any Causes of Action, all as more particularly described in Articles III and IV of the Plan.

The Plan shall be implemented on the Effective Date. At the present time, the Debtors believe that there will be sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to (i) Holders of Allowed Administrative Expense Claims, (ii) Holders of Allowed Priority Non-Tax Claims in Class 1, (iii) the Marquette Allowed Secured Claim in Class 2, (iv) Holders of Allowed Convenience Class Claims in Class 6, and (v) Holders of Allowed Settlement Class Claims in Class 7.[3]

After the Effective Date, with respect to Retained Collateral or retained Other Collateral, payments to be made under the Plan to the Holders of Allowed Claims and Interests in Classes 3, 4, and 5 will be paid by the Debtors in accordance with the Prepetition Agreements (as defined in the Sale Procedures Order). With respect to any Tractors, Trailers, or Other Collateral sold during the Bankruptcy Cases, Holders of Allowed Claims and Interests in Classes 3, 4, and 5 will receive a Secured Claim in the amount of the Sale Proceeds and a Class 8 General Unsecured Claim in the amount of the deficiency, unless the creditor elects to accept a Class 7 Settlement Class Claim. With respect to any Tractors, Trailers, or Other Collateral surrendered during the Bankruptcy Cases, Holders of Allowed Claims and Interests in Classes 3, 4, and 5 will receive the collateral and a Class 8 General Unsecured Claim in the amount of the deficiency, unless the creditor elects to accept a Class 7 Settlement Class Claim.

After the Allowed Class 7 Settlement Class Claims have been paid in full, Holders of Allowed General Unsecured Claims in Class 8 will receive their pro rata share of the Guaranteed Quarterly Distribution until paid in full. The Holders of the Class 9 Equity Interests will not receive any distribution but will retain such Equity Interests under the Plan in exchange for agreeing to work for the Debtors during and after the Bankruptcy Cases.

## C.     <u>Classification of Claims and Equity Interests</u>

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interests of a debtor's equity holders. The Plan divides the Claims and Equity Interests into nine (9) Classes.

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." The Debtors are required, under Section 1122 of the Bankruptcy Code, to classify the Claims and Equity Interests into separate Classes which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests within such Class.

The Debtors believe that they have classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code. It is possible, however, that a Holder of a Claim or another interested party may challenge the classification of Claims and Equity

---

[3] Allowed Class 7 Claims will be paid their pro rata portion of the Settlement Pool. To the extent the amount of the Allowed Settlement Class Claims is less than $800,000, those claims will be paid in full. All amounts in excess of this will be paid from subsequent Guaranteed Quarterly Distributions.

Interests contained in the Plan and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtors, to the extent permitted by the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation and to use the Plan acceptances received in this Solicitation for the purpose of obtaining the approval of the Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. A reclassification of Claims after approval of the Disclosure Statement might necessitate a re-solicitation of acceptances or rejections of the Plan.

## D. <u>Administrative Claims and Priority Claims</u>

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Professional Compensation Claims, DIP Financing Claims, and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan, and the treatment of the Claims is set forth herein. Holders of Allowed Administrative Expense Claims are not entitled to vote on the Plan.

The Holders of Allowed Administrative Expense Claims are entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. The Debtors believe that the Administrative Expense Claims will consist primarily of post-petition operating expenses incurred by the Debtors, DIP Financing Claims, fees and costs of Professionals, fees required to be paid to the United States Trustee, the costs of Solicitation of votes on the Plan (including photocopying and postage charges), and any Administrative Expense Claims Filed with the Bankruptcy Court by the Administrative Claim Bar Date, in each of the foregoing cases as Allowed by a Final Order of the Bankruptcy Court or as otherwise provided in the Plan.

1. Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Reorganized Debtors, each Holder of an Allowed Administrative Claim (other than Holders of Professional Compensation Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; or (2) if such Administrative claim is not Allowed as of the Effective Date, no later than ten (10) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

2. DIP Financing Claims

The DIP Financing Claims shall be Allowed in an amount equal to the amount of such DIP Financing Claims accrued or incurred as of the Effective Date, subject to the provisions of the DIP Financing Order and this Plan. Except to the extent that a Holder of an Allowed DIP Financing

Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Allowed DIP Financing Claim shall be paid in full in Cash by the Debtors on the Effective Date, without setoff, deduction or counterclaim. Upon the payment of the DIP Financing Claims in accordance with the terms of the Plan, on the Effective Date, all Liens and security interests granted to secure such Allowed DIP Financing claims shall be terminated and of no further force and effect.

3.      Professional Compensation Claims

A summary of Professional Fee Claims is as follows:

| Claimant | Estimated Unpaid Fees and Expenses Through April 1, 2018 |
|---|---|
| Okin Adams, LLP, Counsel for the Debtor | $42,000 |
| BVA Restructuring and Advisory, LLC – Financial Advisor to the Debtor | $20,000 |

All requests for payment of Professional Compensation Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Professional Compensation Claim Bar Date; provided, however, that Ordinary Course Professionals shall be compensated in accordance with the terms of the Ordinary Course Professionals Order. Objections to Professional Compensation Claims must be Filed and served on the Reorganized Debtors and the Professional to whose application the objections are addressed no later than the Professional Compensation Claim Objection Deadline. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims after notice and hearing in accordance with the procedures established by the Bankruptcy Court. Allowed Professional Compensation Claims shall be paid by the Debtors in Cash within ten (10) days of the entry of a Final Order allowing such claims.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1003 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

4.      U.S. Trustee Quarterly Fees

The fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) for the periods prior to the Effective Date also constitute Administrative Expense Claims. The

Plan provides that all unpaid fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter (or portion thereof) ending prior to the Effective Date shall be paid to the United States Trustee by no later than thirty (30) days following the Effective Date.

The Estates shall be responsible for timely payment of the United States Trustee quarterly fees incurred pursuant to 28 U.S.C. §1930(a)(6) without the need for the Office of the United States Trustee to file any request for payment. Any such fees due as of the Confirmation Date will be paid in full on the Effective Date of the Plan by the Debtors.

Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6) shall be paid by the Reorganized Debtors, until the earlier of (i) the closing of the Bankruptcy Case by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to another chapter under the Bankruptcy Code. Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).

5.      Allowed Priority Tax Claims

The Administrative Expense Claims consist of the Priority Tax Claims listed on Schedule E of the Debtors' Schedules and/or Filed in the Bankruptcy Case. To the extent that the Holders of Allowed Priority Tax Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, the Holder of such Allowed Priority Tax Claim shall receive on the later of (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim; (iii) the date on which such Allowed Priority Tax Claim first becomes due and payable; or (iv) as soon thereafter as is reasonably practicable, an amount in Cash equal to the unpaid amount of such Allowed Priority Tax Claim; provided, however, that the Reorganized Debtors, shall have the right to pay any Allowed Priority Tax Claim, or the remaining balance of such Claim, in full in Cash at any time on or after the Effective Date, without premium or penalty.

6.      Ordinary Course Professionals

All Claims of Ordinary Course Professionals incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid by the Debtors (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be mutually agreed upon by both the Ordinary Course Professional and the Debtors as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

**E.      Summary of Plan Classifications**

Set forth below is a summary of each Class of Claims and Equity Interests and the expected distributions under the Plan to Holders of Allowed Claims against and Allowed Equity Interests in the Debtors. Estimates of Claims set forth in this Disclosure Statement, if any, are approximate and are based on amounts to be scheduled by the Debtors in their Schedules. Except as otherwise specifically provided in Article VIII of the Plan, the treatment of, and the consideration to be

received by, Holders of Allowed Claims and Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

1.    Allowed Priority Non-Tax Claims

**Description.**  Class 1 consists of Claims asserted under Bankruptcy Code sections 507(a)(3-7 and 9-10).

**Treatment.**  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, on or after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Priority Non-Tax Claim, (i) payment in full in Cash of its Allowed Class 1 Claim; or (ii) such other treatment as is consistent with the requirements of Bankruptcy code section 1129(a)(9).

**Voting.**  Class 1 is Unimpaired under the Plan. Holders of Allowed Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.    Marquette Allowed Secured Claim

**Description.**  Class 2 consists of the Secured Claim of Marquette.  The principal balance and interest of the Class 2 Allowed Secured Claim of Marquette was paid in full during the pendency of the Bankruptcy Cases.  However, Marquette reserved the right to impose the termination fee under the pre-petition loan documents.  The DIP Financing Claim was $270,058.34 as of April 1, 2018, as it may be adjusted by payments made to Marquette during the Bankruptcy Cases, as it may vary from day to day based on the current aggregate accounts receivable financed pursuant to the DIP Financing Agreement and the DIP Financing Order, and by the inclusion of interest, reasonable fees, charges, and costs that are proper under the DIP Financing Agreement and the DIP Financing Order and by virtue of Marquette being an over-secured creditor.

Pursuant to the terms of the DIP Financing Agreement and the DIP Financing Order, the full amount of the DIP Financing Claims are due and payable upon Confirmation of the Plan. Additionally, upon Confirmation, Marquette would be entitled to charge the Debtor a termination fee of $50,000.00.  However, Marquette has agreed to waive the termination fee in consideration for the treatment provided hereunder as an inducement to provide a new loan to the Reorganized Debtors, as set forth herein.

**Treatment.**  Marquette will provide new financing to HCT pursuant to the terms of the Advance Plus Revolving Credit and Security Agreement ("Exit Financing"), on the same terms as the DIP Financing Agreement.  Armada agrees to execute a new unsecured guaranty of the Exit Financing provided to HCT.  The Exit Financing will be used first to pay in full the then-outstanding balance of the DIP Financing Claim, including all accrued interest, reasonable attorney fees and expenses, and other charges described in the parties' loan documents and the DIP Financing Agreement and DIP Financing Order.  Marquette will continue to provide financing to HCT's ongoing post-Confirmation operations.  The Exit Financing shall be secured by the assets of HCT ("Exit Financing Collateral") described as:

All present and future Accounts, all of Debtor's other accounts; chattel paper, instruments, payment intangibles, general intangibles, and documents whether or not considered an Account under the terms of this Agreement; all assets including, without limitation, records, inventory, equipment of every kind and description (other than rolling stock consisting of titled tractors and trailers of Debtor and any proceeds of any kind or nature arising from or relating to the lease, sale or disposition of the tractors and trailers); furniture and fixtures; deposit accounts; money; investment property; letters of credit; notes; tax refunds and insurance proceeds, all as defined in the Uniform Commercial Code and all proceeds thereof, but specifically excluding any causes of action arising under Chapter 5 of the Code.

Marquette shall have and retain its first priority lien and security interest in, to and against the Exit Financing Collateral for all amounts relating to its DIP Financing Claim, including all rights granted to Marquette in the DIP Financing Agreement and the DIP Financing Order. Marquette shall continue to provide financing to HCT following Confirmation and prior to the execution of the Exit Financing, and such financing shall be included in and subject to all of the terms and conditions, and secured by the same Liens and security interests as described in the DIP Financing Agreement. Marquette shall have all of the rights and remedies provided herein with respect to any and all such financing. Upon entry of the Confirmation Order, the Liens granted to Marquette in the Exit Financing Confirmation Order shall be deemed to continue to be first, valid and perfected as against all third parties, without regard to applicable federal, state or local filing and recording statutes, nunc pro tunc as of the date of Confirmation and without further action of any party, including Marquette. Marquette may, but need not, take such steps as it deems desirable to perfect its Liens in the Exit Financing Collateral. All of its Liens shall relate back to the date of their original perfection, without interruption.

Upon Confirmation of the Plan, and in consideration of the undertaking set forth herein, Debtors shall automatically and forever remise, release, discharge Marquette and each of its subsidiaries and affiliates, corporations, companies, divisions, predecessors, successors and assigns and each and all of their directors, officers, employees, attorneys, accountants, consultants and other agents, of and from any and all claims, demands, agreements, contracts, covenants, actions, suits, causes of action, obligations, controversies, costs, expenses, accounts, damages, judgments, losses and liabilities of whatever kind or nature, in law, equity or otherwise whether known or unknown, whether or not concealed or hidden, which they have had, may have had, or now have, or which any of their predecessors, successors or assigns hereafter can, shall or may have, for or by reason of any matter, cause, or thing whatsoever, whenever arising to and including the date of Confirmation, including, but without limitation, any and all claims or causes of action which were or might have been asserted in the Bankruptcy Cases, or any adversary proceeding that may be commenced or may have been commenced in connection therewith, including any right to surcharge the collateral of Marquette under Section 506(c) of the Bankruptcy Code. The release shall be immediately effective upon Confirmation, without the necessity of any further act and shall be binding upon the Debtors and all of their subsidiaries and Affiliates and all trustees, receivers, managing agents, disbursing agents and trustees, including any subsequent Chapter 7 or Chapter 11 trustee appointed in the Bankruptcy Cases.

**Voting**.  Class 2 is Impaired under the Plan.  Holders of Allowed Claims in Class 2 are entitled to vote to accept or reject the Plan.

     3.      Allowed Secured Tractor Claims

**Description.** Class 3 consists of Claims secured by interests in the Debtors' Tractors, including the Claims of (a) Daimler Truck Financial, (b) VFS US LLC, (c) Paccar Financial Corp., (d) MHC Financial Services, Inc., (e) People's Capital and Leasing Corp., and (f) BMO Financial.

**Treatment.** On or after the Effective Date, and except to the except that a Holder of an Allowed Secured Tractor Claim agrees to a less favorable treatment, each Holder of an Allowed Secured Tractor Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Secured Tractor Claim, the following:

    (i)      As relates to any Retained Collateral that is subject to a Pre-Petition Agreement (as defined in the Sale Procedures Order) and that has not been sold or voluntarily surrendered pursuant to the Sale Procedures Order, the Debtors shall, solely as relates to such Retained Collateral, remain bound by and perform in accordance with the Pre-Petition Agreement, including but not limited to making such payments as remain outstanding under the Pre-Petition Agreements in accordance with the terms and conditions of the Pre-Petition Agreements, provided however, that the maturity of such Pre-Petition Agreements shall be extended as set forth in Exhibit A to the Plan, which additional payments shall be made as cure for any payments previously not made by the Debtors. For the avoidance of doubt, any lien granted in or to Retained Collateral pursuant to a Pre-Petition Agreement shall be retained by and for the benefit of such secured creditor holding an Allowed Class 3 Claim. For the further avoidance of doubt, notwithstanding any provision of the Plan otherwise, all guaranty or surety agreement issued by an Exculpated Party or a Released Party in connection with a Pre-Petition Agreement shall continue in full force and effect, but solely as relates to Retained Collateral.

    (ii)     As relates to any Tractor that has been sold pursuant to the Sale Procedures Order, (x) a secured claim in the amount the Sale Proceeds, which shall be paid in accordance with the terms of the Sale Procedures Order, and (y) any deficiency claim, which shall be treated as either a Class 8 General Unsecured Claim unless creditor elects to accept a Class 7 Settlement Class Claim.

    (iii)    As relates to any Tractor that has been surrendered pursuant to the Sale Procedures Order, (x) the collateral, and (y) any deficiency claim, which shall be treated as a Class 8 General Unsecured Claim unless creditor elects to accept a Class 7 Settlement Class Claim.

    (iv)    For purposes of voting and Confirmation, each secured creditor noted above shall be classified in separate subclasses within Class 3 - *i.e.* 3(a); 3(b); 3(c); 3(d), 3(e); and 3(f).

    (v)     A schedule of Allowed Secured Tractor Claims is attached to the Plan as Exhibit 1. To the extent a Claim is not listed on Exhibit 1, the collateral related to such Claim

has been sold or surrendered and any amounts still due shall be treated consistent with subsections (ii) or (iii), above.

**Voting.** Class 3 is Impaired under the Plan. Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Allowed Secured Trailer Claims

**Description.** Class 4 consists of Claims secured by interests in the Debtors' Trailers, including the Claims of (a) Signature Financial, (b) 1st Source Bank, (c) Merchants Capital Resources, (d) Scottrade Equipment Finance, (e) Webster Capital Finance, and (f) Dolores State Bank.

**Treatment.** On or after the Effective Date, and except to the except that a Holder of an Allowed Secured Trailer Claim agrees to a less favorable treatment, each Holder of an Allowed Secured Trailer Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Secured Trailer Claim, the following:

(i) As relates to any Retained Collateral that is subject to a Pre-Petition Agreement (as defined in the Sale Procedures Order) and that has not been sold or voluntarily surrendered pursuant to the Sale Procedures Order, the Debtors shall, solely as relates to such Retained Collateral, remain bound by and perform in accordance with the Pre-Petition Agreement, including but not limited to making such payments as remain outstanding under the Pre-Petition Agreements in accordance with the terms and conditions of the Pre-Petition Agreements, provided however, that the maturity of such Pre-Petition Agreements shall be extended as set forth in Exhibit B to the Plan, which additional payments shall be made as a cure for any payments previously not made by the Debtors. For the avoidance of doubt, any lien granted in or to Retained Collateral pursuant to a Pre-Petition Agreement shall be retained by an for the benefit of such secured creditor holding an Allowed Class 4 Claim.

(ii) As relates to any Trailer that has been sold pursuant to the Sale Procedures Order, (x) a secured claim in the amount the Sale Proceeds, which shall be paid in accordance with the terms of the Sale Procedures Order, and (y) any deficiency claim, which shall be treated as either a Class 8 General Unsecured Claim unless creditor elects to accept a Class 7 Settlement Class Claim.

(iii) As relates to any Trailer that has been surrendered pursuant to the Sale Procedures Order, (x) the collateral, and (y) any deficiency claim, which shall be treated as a Class 8 General Unsecured Claim unless creditor elects to accept a Class 7 Settlement Class Claim or Class 6 Convenience Class Claim.

(iv) During the Bankruptcy Cases, Scottrade Equipment Finance provided written notice to the Debtors that it had assigned its Claim to TCF Equipment Finance. No notice has been filed pursuant to Bankruptcy Rule 3001(e) and unless filed before Confirmation, such Claim shall remain with Scottrade.

(v)      Dolores State Bank was paid during the Bankruptcy Cases and released its Claim. Accordingly, Dolores State Bank's Claim shall be Allowed at $0.00 and Dolores State Bank shall have no further Claims against the Debtors.

(vi)     For purposes of voting and Confirmation, each secured creditor noted above shall be classified in separate subclasses within Class 4 - *i.e.* 4(a); 4(b); 3(c); 4(d); 4(e); and 4(f).

(vii)    A schedule of Allowed Secured Trailer Claims is attached to the Plan as Exhibit 2. To the extent a Claim is not listed on Exhibit 2, the collateral related to such Claim has been sold or surrendered and any amounts still due shall be treated consistent with subsections (ii) or (iii), above.

**Voting.**  Class 4 is Impaired under the Plan.  Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.       Allowed Other Secured Claims

**Description.**  Class 5 consists of Secured Claims that are not DIP Financing Claims, Secured Tractor Claims, Secured Trailer Claims, or Secured Tax Claims.

**Treatment.**  On or after the Effective Date, and except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, compromise, release, and discharge of and in exchange for each Other Secured Claim, the following:

(i)      As relates to any Other Collateral that is subject to a Pre-Petition Agreement (as defined in the Sale Procedures Order) and that has not been sold or voluntarily surrendered pursuant to the Sale Procedures Order, the Debtors shall, solely as relates to such Other Collateral, remain bound by and perform in accordance with the Pre-Petition Agreement, including but not limited to making such payments as remain outstanding under the Pre-Petition Agreements in accordance with the terms and conditions of the Pre-Petition Agreements, provided however, that the maturity of such Pre-Petition Agreements shall be extended as set forth in Exhibit C to the Plan, which additional payments shall be made as cure for any payments previously not made by the Debtors.  For the avoidance of doubt, any Lien granted in or to Retained Collateral pursuant to a Pre-Petition Agreement shall be retained by and for the benefit of such secured creditor Holding an Allowed Class 5 Claim.

(ii)     As relates to any Other Collateral that has been sold pursuant to the Sale Procedures Order, (x) a secured claim in the amount the Sale Proceeds, which shall be paid in accordance with the terms of the Sale Procedures Order, and (y) any deficiency claim, which shall be treated as either a Class 8 General Unsecured Claim unless creditor elects to accept a Class 7 Settlement Class Claim or Class 6 Convenience Class Claim.

(iii)    As relates to any Other Collateral that has been surrendered pursuant to the Sale Procedures Order, (x) the collateral, and (y) any deficiency claim, which shall be

treated as a Class 8 General Unsecured Claim unless creditor elects to accept a Class 7 Settlement Class Claim.

(iv)     For purposes of voting and Confirmation, each Other Secured Claim shall be classified in separate subclasses within Class 5 – *i.e.* 5(a); 5(b); 5(c); etc.

(v)     A schedule of all Allowed Other Secured Claims is attached to the Plan as Exhibit 3. To the extent a prepetition secured obligation, other than a Tractor or Trailer Claim, is not listed on Exhibit 3, the collateral has been sold or surrendered and any remaining obligations will be treated pursuant to subsections (ii) or (iii), above.

**Voting.** Class 5 is Impaired under the Plan. Holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.     Convenience Class

**Description.** Class 6 consists of Claims in an amount less than $5,000.00 and Claims of creditors who affirmatively elect treatment as a Convenience Class Claim on their Ballot.

**Treatment.** On the Effective Date, Holders of Allowed Claims in Class 6 shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Class 5 Claim, the lesser of (i) $5,000.00 or (ii) if the Claim amount is less than $5,000.00, the full amount of such Claim.

**Voting.** Class 6 is Unimpaired under the Plan. Holders of Allowed Claims in Class 6 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

7.     Settlement Class

**Description.** Class 7 consists of Claims of creditors who affirmatively accept the Class 7 Settlement on their Ballot and elect payment from the Settlement Pool.

**Treatment.** On the Effective Date, and except to the extent that a Holder of an Allowed Settlement Class Claim agrees to a less favorable treatment, each Holder of an Allowed Settlement Class Claim shall receive their pro rata share of the Settlement Pool.

After receiving their pro rata share of the Settlement Pool, and to the extent the Settlement Class Claim remains unsatisfied, such Holders will receive their pro rata share of the Guaranteed Quarterly Distribution until such time as the Allowed Settlement Class Claims are paid in full and appropriate reserves are established for any such Disputed Claims.

If any portion of the Settlement Pool remains after the Allowed Settlement Class Claims are satisfied and the Disputed Claims Reserve has been established with respect to such Claims, the Reorganized Debtors may, in their sole discretion, use such remaining amounts to make the Guaranteed Quarterly Distribution to Class 8, as provided below.

**Voting.** Class 7 is Impaired under the Plan. Holders of Allowed Claims in Class 7 are entitled to vote to accept or reject the Plan, *provided however*, that any creditor opting into Class

7 shall be deemed to accept the Plan.

8.    Allowed General Unsecured Claims

**Description.**   Class 8 consists of all General Unsecured Claims that are not otherwise treated under Classes 6 or 7.  Class 8 also includes the deficiency Claims of Holders of Allowed Claims in Classes 3, 4, and 5 who do not affirmatively accept the Class 7 Settlement and elect payment of the deficiency from the Settlement Pool.

**Treatment.**   After the Allowed Settlement Class Claims have been paid in full, and except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive their pro rata share of the Guaranteed Quarterly Distribution (a minimum of $250,000.00) until such time as all Allowed General Unsecured Claims are paid in full.

Holders of Allowed General Unsecured Claims shall be subject to the channeling injunction set out in Article VIII.G of the Plan until such time as all Allowed Claims in Class 8 are paid in full.

**Voting.**   Class 8 is Impaired under the Plan.  Holders of Allowed Claims in Class 8 are entitled to vote to accept or reject the Plan.

9.    Equity Interests

**Description.**   Class 9 consists of Equity Claims and Interests in the Debtors.

**Treatment.**   On the Effective Date, in exchange for agreeing to work for the Debtors during the Bankruptcy Cases and their continued work for the Reorganized Debtors, Holders of Equity Claims and Interests in the Debtors shall receive their equity in the Debtors.

**Voting.**   Class 9 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 9 are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

## F.    <u>Treatment of Executory Contracts and Unexpired Leases</u>

*Assumption or Rejection of Executory Contracts and Unexpired Leases.*   Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all Executory Contracts and Unexpired Leases that currently exist between the Debtors and another Person or Entity and not listed on the Schedule of Rejected Contracts attached as Exhibit D to the Plan shall be deemed accepted by the Debtors as of the Effective Date (collectively, the "Accepted Contracts"); provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Exhibit D to the Plan and add any Accepted Contracts thereto or to delete any Rejected Contracts therefrom, in which event such Executory Contract(s) or Unexpired Lease(s) shall be deemed to be rejected (if added) or assumed (if deleted).  The Debtors shall provide notice of any amendments to the Schedule of Rejected Contracts to the parties to the Executory Contracts and Unexpired Leases affected thereby.  The listing of a document on the Schedule of Rejected Contracts shall not constitute an admission by the Debtors that such document is an Executory Contract or an Unexpired Lease or that the Debtors have any liability thereunder.  Any Executory Contract or Unexpired Lease that

exists between the Debtors and another Person or Entity and that is listed on the Schedule of Rejected Contracts shall be deemed rejected by the Debtors as of the Confirmation Date unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to reject such Executory Contract or Unexpired Lease.

*Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.* Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the Accepted Contracts pursuant to Article V of the Plan, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article V of the Plan, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject any Unexpired Lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such Unexpired Lease. The assumption by the Debtors of an Accepted Contract shall be binding upon any and all parties to such Accepted Contract as a matter of law, and each such Accepted Contract shall be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

*Inclusiveness.* Unless otherwise specified on the Schedule of Rejected Contracts, each Executory Contract and Unexpired Lease listed or to be listed on such Schedule shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on Exhibit D to the Plan.

*Cure of Defaults.* Any lessor or other party to an Accepted Contract (except those lessors or other parties whose Unexpired Leases or Executory Contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any Unexpired Lease or Executory Contract under Article V, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Reorganized Debtors. The Reorganized Debtors shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than ninety (90) days following the Effective Date, the Reorganized Debtors shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto or as may otherwise be agreed to by the parties.

*Claims under Rejected Executory Contracts and Unexpired Leases.* Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any Executory Contract or Unexpired Lease, including those listed in the Schedule of Rejected Contracts, must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims, or such Claim shall be forever barred and unenforceable against the Debtors or the

Reorganized Debtors. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an Executory Contract or Unexpired Lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an Executory Contract or Unexpired Lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an Executory Contract or Unexpired Lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed General Unsecured Claims in Class 8.

*Insurance Policies.* All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as Executory Contracts under the Plan and are expressly assumed by the Debtors, regardless of whether they are included on the Schedule of Rejected Contracts. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Person or Entity with respect to such Executory Contracts or Unexpired Leases.

## G.  Means of Implementation of the Plan

*Continued Corporate Existence.* The Debtors will continue to exist after the Effective Date as separate corporate entities, with all of the powers of a corporation under applicable law and pursuant to their certificates of incorporation and bylaws in effect prior to the Effective Date.

*Corporate Action.* All matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate action to be taken by or required of the Debtors or the Reorganized Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, members, officers, or directors of the Debtors or the Reorganized Debtors.

*Control of the Reorganized Debtors.* Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the Current Directors and Officers of the Debtors shall be established as the directors and officers of the Reorganized Debtors without any further action by any party.

*Exit Financing.* The Debtors intend to enter into a new credit facility with Marquette as Exit Financing for continued operations as set forth in Article III.C.2 of the Plan.

*Preservation of Causes of Action.* A Schedule of Retained Causes of Action is attached to this Disclosure Statement as Exhibit 5. The Debtors intend to preserve all potential Causes of Action, whether known or unknown, for the benefit of the Debtors' Estates and their creditors regardless of whether specifically described in Exhibit 5. The Debtors do not presently know the full extent of the Causes of Action which they may be entitled to bring. However, the Debtors specifically preserve all Causes of Action, including, but not limited to Avoidance Actions, turnover of estate property, and breach of fiduciary duty, civil conversion, theft, sabotage, contribution, indemnification, and/or negligence.

For purposes of voting on the Plan, all creditors are advised that the Reorganized Debtors will have substantially the same rights that the Debtors would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such creditor or any other Person or Entity, unless such creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any *res judicata* or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

Further, no creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to, or on the belief that it will, obtain any defense to any Cause of Action. No creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a Final Order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtors, whether now known or unknown. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtors, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

*Pursuit of Causes of Action.* On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtors, except to the extent a creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. The Reorganized Debtors will have the right, in their sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as otherwise provided in the Plan. The Debtors are not currently in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtors state that any party in interest that engaged in Prepetition business or other transactions with the Debtors, or that received Prepetition payments from the Debtors may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. The costs and expenses (including legal fees) to pursue the Causes of Action shall be paid by the Reorganized Debtors.

The Estates shall remain open, even if the Bankruptcy Cases shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the recoveries have been received by the Reorganized Debtors; provided, however, that nothing in the Plan or the Disclosure Statement shall prohibit the Debtors from pursuing any Causes of Action (excluding the Avoidance Actions) in any courts other than the Bankruptcy Court.

*Prosecution and Settlement of Claims and Causes of Action*. The Reorganized Debtors (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, the Reorganized Debtors shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $100,000.00, then the Reorganized Debtors may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $100,000.00, then the Reorganized Debtors shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019.

## H.    Distributions under the Plan

*Distribution.* As soon as reasonably practicable (as determined by the Reorganized Debtors) after the Effective Date, the Reorganized Debtors shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes 1, 2, 3, 4, 5, 6 and 7. Thereafter, the Reorganized Debtors shall make a Guaranteed Quarterly Distribution as and when required by the terms of the Plan.

*Address for Distributions*. Distributions to a Holder of an Allowed Claim shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Reorganized Debtors at the time of the Distribution, unless the Reorganized Debtors have been notified in writing of a change of address, including by the Filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. The Reorganized Debtors shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

*Determination of Claims.* From and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to, and shall, File, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-Filed Claims and Claims resulting from the rejection of Executory Contracts or Unexpired Leases, if any, all objections to Claims shall be Filed with the Bankruptcy Court by no later than (i) one hundred eighty (180) days after the Effective Date, or (ii) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such Claims. Holders of General Unsecured Claims that

have not Filed such Claims on or before the Bar Date shall serve the Reorganized Debtors with any request to the Bankruptcy Court for allowance to File late General Unsecured Claims.  If the Bankruptcy Court grants the request to File a late General Unsecured Claim, such General Unsecured Claim shall be treated in all respects as a General Unsecured Claim.  Objections to late-Filed Claims and Claims resulting from the rejection of Executory Contracts or Unexpired Leases shall be Filed on the later of (a) one hundred eighty (180) days following the Effective Date or (b) the date that is sixty (60) days after the Reorganized Debtors receive actual notice of the Filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors effect service in any of the following manners:  (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has Filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise.  If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and distribution.  The Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.

Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim.  The determination of Claims in estimation hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Procedures for specific estimation hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

*Distributions as to Holders of Disputed Claims.*  Notwithstanding any provision in the Plan to the contrary, no distribution shall be made to the Holders of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.  Distributions on account of Disputed Claims shall be held, Pro Rata, in the Disputed Claims Reserve until such Claims have been either Allowed or

Disallowed. To the extent a Disputed Claim becomes Allowed the distribution reserved for such Claim shall be distributed to the Holder thereof. To the extent a Disputed Claim becomes disallowed, the distribution reserved for such Claim may be distributed to Holders of Allowed Claims via the Guaranteed Quarterly Distribution.

For purposes of this section, "Pro Rata" means, as to a particular Holder of a Claim in a particular Class, the ratio that the amount of such Claim held by such Claim Holder bears to the aggregate amount of all Claims in the particular Class, and such ratio shall be calculated as if all Claims in such Class are Allowed Claims as of the Effective Date.

*Minimum Distributions.* To avoid the disproportionate expense and inconvenience associated with making *de minimis* distributions, the Reorganized Debtors will not be required to make, and will be excused from making, distributions in amounts of less than fifty dollars ($50.00) each to Holders of Allowed General Unsecured Claims.

*Undeliverable and Unclaimed Distributions.* In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

## I.     Conditions Precedent to Confirmation of the Plan and the Effective Date

The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtors:

1. The Bankruptcy Court shall have entered the Confirmation Order in a form and substance acceptable to the Debtors and shall not (a) have been reversed or vacated, (b) be subject to a then-effective stay, or (c) have been modified or amended.

2. The Plan including any amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but before the Effective Date, shall be in a form and substance acceptable to the Debtors; and

3. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

Promptly following the satisfaction or the waiver of all of the conditions set forth in Article IX.B of the Plan, the Debtors shall File a notice (the "Effective Date Notice") with the Bankruptcy Court designating the Effective Date. The Debtors shall serve the Effective Date Notice on the Debtors' Master Service List.

**J.**    **Discharge, Exculpation from Liability, Release and Injunction Provisions under the Plan**

*Release of Debtors*.  Pursuant to Bankruptcy Code section 1141(d), and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided for in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests related to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

*Release of Liens*.  Except as otherwise provided in the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Secured Claims that the Debtors elect to reinstate in accordance with Article III.C hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  On and after the Effective Date, any Holder of such Secured Claim (and the applicable agents for such holder), at the expense of the Reorganized Debtor, shall be authorized and directed to release any collateral or other property of either Debtor (including any Cash collateral and possessory collateral) held by such Holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

*Release by Holders of Claims and Interests.*  As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany

transactions, the Bankruptcy Cases, the formulation, preparation dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

*Exculpation*.  The Exculpated Parties, including the Debtors, their officers and directors, and their Professionals (acting in such capacity), (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act, event, or omission from the Petition Date to the Effective Date in connection with or arising out of the Bankruptcy Cases, the confirmation of the Plan, the Consummation of the Plan, the administration of the Plan or the assets and property to be distributed pursuant to the Plan (including unclaimed property under the Plan), unless such Entity's action is determined as (i) bad faith; (ii) actual fraud; (iii) willful misconduct; or (iv) gross negligence, in each case by a Final Order of a court of competent jurisdiction.  Each Entity may reasonably rely upon the opinions of counsel, certified public accountants, and other experts or professionals employed by the Debtors.

With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The rights granted under Article VIII of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase or securities.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained therein, the provisions of Article VIII of the Plan shall not release, or be deemed a release of, any of the Causes of Action.

*Injunction*.  Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been satisfied, released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of

such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon Confirmation of the Plan, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of any Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.

*Channeling Injunction*. In addition, upon Confirmation of the Plan, all creditors of the Debtors having an Allowed General Unsecured Claim under Class 7 herein shall be temporarily enjoined, pursuant to Section 105 of the Bankruptcy Code, from proceeding against any other obligor or guarantor on that debt for the collection of all or any portion of their Allowed General Unsecured Claim. Such injunction shall remain in effect only for so long as the Reorganized Debtors comply with the terms of the Plan. Any violation of the Plan that remains uncured for thirty (30) days after receipt by the Reorganized Debtors of written notice from any party affected by such violation shall, without order of the Bankruptcy Court, automatically result in the dissolution of the injunction granted hereunder as to the affected party.

*Term of Certain Injunctions and Automatic Stay*. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Bankruptcy Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtors' liability on prepetition claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtors affirmatively elect to have their liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtors affirmatively elect to have the automatic stay lifted and to have the their liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided herein.

*No Liability for Tax Claims*. Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefore, no Claim of such Governmental Unit shall be Allowed against the Debtors or their respective directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of their Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

*Regulatory or Enforcement Actions*. Notwithstanding anything to the contrary set forth herein, nothing in the Plan or the Confirmation Order shall restrict any federal government regulatory agency, including the SEC, from pursuing any regulatory or police enforcement action, including for violations of the federal securities laws, or performing its statutory duties against any Person or Entity in any forum, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code.

## K.    Modification of Plan

The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements. Specifically, the Debtors may modify the Plan under Article X.A to satisfy any requirements under Section 1145 of the Bankruptcy Code, and any such modifications shall be deemed non-material and to not materially adversely affect the interests, rights, or treatment of any Class of Claims or Equity Interests under the Plan.

After the entry of the Confirmation Order, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) may modify the Plan to remedy any defect or omission herein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtors or the Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims under the Plan.

After the entry of the Confirmation Order and before substantial consummation of the Plan, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtors or the Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Class of Claims materially adversely affected and a hearing, (c) such modification is accepted by at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification, and (d) the Debtors or the Reorganized Debtors (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

Notwithstanding anything to the contrary contained in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtors (prior to the Effective Date) or the Reorganized Debtors (on and after the Effective Date).

## L. Confirmation Over Objections.

In the event any Impaired Class of Claims votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article X, the Debtors hereby request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Debtors reserve any and all rights they may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## M. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

## A. General

The tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests (collectively, "Holders") are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtors and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holder's particular tax situation. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTORS' GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

**B.    General Federal Income Tax Consequences to Holders**

*In General*.  The following discussion addresses certain of the material consequences of the Plan to Holders.  Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest.  **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders of Claims and Equity Interests*.  The Holders of Claims against and Equity Interests in the Debtors are urged to consult with their tax advisors as to the consequences of the Plan to them.  Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(1)    The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(2)    The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtors and the character of that gain or loss.

(3)    The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(4)    Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(5)    The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(6)    The effect of a Holder of a Claim or Equity Interest receiving deferred distributions or distributions that are contingent in amount.

## C.     Certain Federal Income Tax Consequences to the Debtors

Taxpayers are generally required to recognize taxable income as a result of cancellation of debt. The receipt of borrowed funds is not subject to tax, on the premise that the debtor will repay them. If the debt is cancelled without repayment, the recognition of income takes into account a debtor's receipt of the borrowed funds.

Special rules, however, apply to the cancellation of debt in a bankruptcy proceeding. Generally, a debtor in a bankruptcy case is not required to recognize income from the cancellation of debt. However, the debtor has to pay for this exclusion by reducing specified tax attributes, such as any net operating loss ("NOL") incurred by the taxpayer in the year that the debt discharge occurs, any NOL carryovers to that year, and tax credit and capital loss carryforwards.

*Limitation on NOL Carryforwards and Other Tax Attributes.* To deter "trafficking" in NOL carryforwards, Section 382 of the Tax Code limits a corporation's ability to use losses incurred before an "ownership change" to offset income earned thereafter. A similar limitation applies to tax credits. In general, an ownership change occurs if more than fifty percent (50%) of the stock of a corporation changes hands within a three-year period.

If an ownership change occurs, the corporation can use pre-change NOL carryforwards to offset only an amount of income each year equal to the value of the stock of the corporation immediately before the ownership change multiplied by a prescribed interest rate. The limitation is intended to estimate the earning power of the corporation's pool of capital at the time of the ownership change. The limitation thus prevents the use of pre-change NOL carryforwards to offset income from new capital contributed by the new owners.

Special rules apply, however, in the case of ownership changes that occur in a bankruptcy proceeding. Under the general rules, the annual limitation usually would be quite low, because the corporation's stock immediately before the ownership change often has little or no value. Essentially eliminating the NOL carryforwards of a corporation in bankruptcy could hinder the corporation's ability to reorganize successfully, contrary to the goals of the federal bankruptcy laws. Therefore, Congress provided special bankruptcy rules in Section 382. If an ownership change occurs in bankruptcy, Section 382(l)(6) allows the corporation, in computing the annual limitation on the use of NOL carryforwards, to increase its value to reflect the cancellation of claims in the bankruptcy reorganization. The regulations provide for this result by using as the value of corporation the lesser of the value of its gross assets immediately before the ownership change or the value of its stock immediately thereafter. This amount is multiplied by the prescribed interest rate to arrive at the annual limitation on the amount of income that can be offset by pre-change NOL carryforwards.

Another special rule, provided in Section 382(l)(5), applies if at least fifty percent (50%) of the corporation's stock immediately after the ownership change is owned by persons who were shareholders or creditors of the corporation immediately before the ownership change. For purposes of computing the fifty-percent threshold, however, stock issued to creditors who own at least five percent (5%) of the corporation's stock after the ownership change is taken into account only if the creditor held its claim for at least eighteen months before filing of the bankruptcy petition or if the claim arose in the ordinary course of the corporation's business and was owned at all times by the same person. When the conditions of Section 382(l)(5) are met, the annual

limitation on NOL carryovers does not apply. Instead, the corporation is required to reduce its NOL carryforwards by the amount of deductions claimed in the prior three years for interest on debt that is exchanged for stock in the bankruptcy reorganization. The corporation can then use its remaining NOL carryforwards to offset future income without limitation. Even if the corporation qualifies for the special rule of Section 382(l)(5), it can still elect to apply instead the general bankruptcy rule of Section 382(l)(6), under which an annual limitation applies, but is computed under special rules taking into account the effect of the cancellation of claims on the value of the corporation.

Any limitation on NOL carryforwards that may result from the ownership change will probably also apply to "built-in" losses and deductions that accrued economically before the ownership change but are not taken into account under tax accounting rules until after the ownership change.

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT AND DO NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

## IX.     VOTING ON AND CONFIRMATION OF THE PLAN

### A.     Confirmation and Acceptance by All Impaired Classes

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the Plan be accepted by all Impaired Classes of Claims and Equity Interests, and satisfaction of the matters described below.

*Feasibility*. A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtors believe that they will be able to perform their obligations under the Plan without further financial reorganization.

The Plan provides for payment in full of Allowed Claims, including contingent, unliquidated and Disputed Claims to the extent they become Allowed Claims, in the order of their priority. At the present time, the Debtors believe that they will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims, Allowed Priority Non-Tax Claims in Class 1, the Marquette Allowed Secured Claim in Class 2, and Allowed Convenience Class Claims in Class 6. Further, the Debtors believe they will have sufficient funds available to establish the Settlement Pool and distribute it Pro Rata to Holders of Allowed Settlement Class Claims in Class 7.

*Best Interests Standard*. The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received

or retained if the Debtors were liquidated under Chapter 7 on the same date. The Debtors believe that Distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7.

**B.**     **Confirmation Without Acceptance by All Impaired Classes**

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly*. The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard*. With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. The Debtors believe that the Plan meets these standards.

The Debtors believe that the requirements of Bankruptcy Code Section 1129(a) and (b) are met under the Plan. Accordingly, if necessary, the Debtors will seek Confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code and believe it meets the requirements for Confirmation by the Bankruptcy Court notwithstanding the non-acceptance by an Impaired Class of Claims or Equity Interests.

The Debtors intend to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**C.**     **Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Bankruptcy Court may permit the Filing of an amended plan, dismiss the case, or convert the case to Chapter 7. In a Chapter 7 case, the Chapter 7 trustee would have to gain an understanding of the nature of the Causes of Action and pursue such Causes of Action for the benefit of the Estates. The Debtors believe that this would result in unnecessary costs and delay.

## X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

### A.     <u>Alternative Plans of Reorganization</u>

If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest in the Bankruptcy Case could attempt to formulate and propose a different plan or plans. Such plans might involve a reorganization, an orderly liquidation of the Debtors' assets, or a combination thereof.  The Debtors believe that the Plan will enable Holders of Claims to be paid the maximum amount possible for their Allowed Claims.

### B.     <u>Liquidation under Chapter 7 or Chapter 11</u>

If a plan is not confirmed, the Bankruptcy Case may be converted to a Chapter 7 liquidation case.  In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors.  The proceeds of the liquidation would be distributed to the Holders of Claims and Equity Interests of the Debtors in accordance with the priorities established by the Bankruptcy Code.

In general, the Debtors believe that liquidation under Chapter 7 would result in diminution of the value of the interests of such Holders because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) failure to realize the full value of the Debtors' assets; (d) the inability to utilize the work product and knowledge of the Debtors and their Professionals; and (e) the substantial delay which would elapse before creditors would receive any distribution in respect of their Claims.  Accordingly, the Debtors believe that the Plan is superior to liquidation under Chapter 7.

## XI.     SUMMARY, RECOMMENDATION AND CONCLUSION

The Plan provides for an orderly and prompt distribution to Holders of Allowed Claims and Allowed Equity Interests against the Debtors.  The Debtors believe that their efforts to maximize the return for Holders of Claims and Equity Interests have been full and complete.  The Debtors further believe that the Plan is in the best interests of all creditors.  For these reasons, the Debtors urge that the Plan be accepted.

Dated: April 20, 2018         Respectfully submitted,

HIGH COUNTRY TRANSPORTATION, INC. AND ARMADA LEASING, LLC

By:    */s/ Kirk Crowley*
       Kirk Crowley
       Vice President
       High Country Transportation, Inc.

**OKIN ADAMS LLP**

By:    /s/ *Matthew S. Okin*
       Matthew S. Okin
       Texas Bar No. 00784695
       Email: mokin@okinadams.com
       David L. Curry, Jr.
       State Bar No. 24065107
       Email: dcurry@okinadams.com
       1113 Vine St. Suite 201
       Houston, TX 77002
       Tel: (713) 228-4100
       Fax: (888) 865-2118

       and

       Raymond J. Urbanik
       Texas Bar No. 20414050
       Email: rurbanik@okinadams.com
       3811 Turtle Creek Blvd., Suite 780
       Dallas, Texas 75219
       Tel: (214) 382-4995
       Fax: (888) 865-2118

**ATTORNEYS FOR THE DEBTORS**